## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**MONICA A. MAXWELL,**

      **Plaintiff,**

**vs.**                    **Case No. 1:13cv172-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act.   After careful consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

**I.  Procedural History**

On July 3, 2007, Plaintiff, Monica A. Maxwell, filed an application for DIB initially alleging disability beginning June 30, 2007.   R. 100, 204-05, 232.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   Plaintiff claimed she heard voices, was depressed, and cried at work.   R. 232.   Plaintiff's last date of insured status for DIB is December 31, 2012.   R. 100.

Plaintiff's claims were denied initially on November 16, 2007, and on reconsideration on March 4, 2008.   R. 93-96, 100, 115, 120.   On March 31, 2008, Plaintiff requested a hearing.   R. 100, 123.   On November 23, 2009, Administrative Law Judge (ALJ) Betty Roberts Barbeito held an evidentiary, video hearing with the ALJ appearing in Orlando, Florida, and Plaintiff and her representative in Ocala, Florida. R. 35-64.   Susanna D. Roche testified as an impartial vocational expert.   R. 57-62. Plaintiff was represented by Pamela C. Dunmore, a non-attorney representative. R. 18, 37, 100, 134-37.

On January 11, 2010, the ALJ entered a decision concluding that Plaintiff was not disabled.   R. 100-07.   On June 29, 2011, the Appeals Council granted Plaintiff's request for review, R. 160, 162, and remanded the case to an ALJ to include all evidence that was not formally offered into evidence during the first hearing, give consideration to Plaintiff's residual functional capacity (RFC), obtain evidence from a vocational expert to clarify the effect of the assessed limitations in Plaintiff's occupational base, determine whether Plaintiff is under a disability taking into consideration all of her impairments, including her

drug addiction and/or alcoholism (DAA), and to offer Plaintiff an opportunity for a hearing. R. 18, 112-13.

On April 3, 2012, ALJ Teresa J. McGarry held a video hearing with Plaintiff appearing in Gainesville, Florida, and the ALJ appearing in Jacksonville, Florida. R. 18, 65-92.   Melissa T. Brooks, an impartial vocational expert, appeared at the hearing. R. 18, 87-91.   Plaintiff was represented by Ms. Dunmore.   R. 18, 67. At the hearing, Plaintiff, through Ms. Dunmore, amended her alleged onset date of disability to January 30, 2008.   R. 18, 72.   On May 18, 2012, the ALJ denied Plaintiff's application for benefits.   R. 18-29.   Plaintiff requested that the Appeals Council review the ALJ's decision, R. 12-13, which the Appeals Council denied on July 18, 2013, and the ALJ's decision became the Commissioner's final decision.   R. 1-3; *see* 20 C.F.R. § 404.981.   On September 6, 2013, Plaintiff filed a Complaint in this Court and seeks judicial review of the Commissioner's decision.   Doc. 1.   Both parties filed memoranda of law, which have been considered.   Docs. 15 and 18.

## II.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual

findings are conclusive if supported by substantial evidence."   Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'"   Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."   42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).

---

[1]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).   "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

Both the "impairment" and the "inability" must be expected to last not less than 12 months.

Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled to DIB if he

or she is under a disability prior to the expiration of his insured status.   *See* 42 U.S.C. §

423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human

Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human

Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

§ 404.1520(a)(4)(i)-(v):

1.   Is the individual currently engaged in substantial gainful activity?[2]

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.   Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[3]

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the

application for benefits.   A positive finding at step three results in approval of the

application for benefits.   At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.   Consideration

---

[2]   *See* 20 C.F.R. § 404.1572.

[3]   A residual functional capacity (RFC) is the most a claimant can still do despite her limitations.   20 C.F.R. § 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c).

is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden then shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

§ 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."   Wilson v. Barnhart, 282 F.3d at 1227.   *See also* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).   The ALJ is not required, however, to include findings in the hypothetical that the ALJ has properly rejected as unsupported.   *See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004); McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

## III.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant meets the insured status requirements of the Social Security Act through on December 31, 2012."   R. 20.

2. "The claimant has not engaged in substantial gainful activity since January 30, 2008, the alleged onset date." *Id.*

3. "The claimant has the following severe impairments: asymptomatic human immunosufficiency virus (HIV) infection; hypertension; bipolar affective disorder; schizophrenia paranoid type." *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.*

5. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to 1-2 step task work, with no production pace demand, and infrequent, superficial contact with people." R. 22.

6. "The claimant is unable to perform any past relevant work" as a day worker, medium as generally performed, but light as actually performed per Plaintiff's report, unskilled work with an SVP of 2. R. 27.

7. "The claimant . . . was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date." *Id.* "The claimant has a limited education and is able to communicate in English." *Id.*

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* These jobs include housekeeping cleaner, library page, and flagger. R. 28. Each job is classified as light, unskilled work, and an SVP of 2. *Id.*

9. "The claimant has not been under a disability, as defined in the Social Security Act, from January 30, 2008, through the date of" the ALJ's decision. *Id.*

## IV.  The Medical and Other Evidence

On November 1, 2007, Louis Legum, Ph.D., a licensed psychologist, examined

Plaintiff at the request of the agency.   R. 329-32; *see* R. 23, 26.   Plaintiff indicated that

she drove herself to the appointment.   R. 330.   She did not provide the requested

information regarding her medication, medical treatment, and tests for the examiner.   R. 329.   Plaintiff denied taking any medication.   R. 331.

Plaintiff denied experiencing any blackouts from drinking.   R. 330.   Plaintiff reported that, approximately every two months, she leaves her home for periods of time up to three weeks and lives on the streets, but has no memory of what she has done.   R. 330.   Plaintiff reported hearing a woman's voice calling her name every night that tells her to get up, so she beats things, including kicking the wall.   R. 331.   Plaintiff also reported difficulty sleeping, but acknowledged sleeping during the day.   R. 330.   She also indicated that she sleeps with knives surrounding her.   R. 331.

Plaintiff was appropriately dressed and groomed.   R. 331.   She was cooperative and had good eye contact; her intelligence was probably below average and she was oriented to all three spheres.   Her speech was articulate and at a regular rate and rhythm.   Her affect was restricted and her mood was anxious.   She did not indicate any suicidal or homicidal ideation.   Her thought process was integrated with no hallucinatory or delusional thinking.   Her memory, both recent and remote, appeared poor.   Her judgment and insight were minimal.   R. 331.

Dr. Legum stated, "[t]rying to determine the validity of [Plaintiff's] statements was most difficult as she tended to contradict herself repeatedly."   *Id.*   Dr. Legum was concerned by Plaintiff's statements that she disappears for weeks at a time every couple of months, but explained that there was no evidence that these periods were "psychotically produced, as that part appears to have her involved in agoraphobic behaviors, along with decorating her bed with knives."   *Id.*   He also pointed out the

inconsistency between Plaintiff's statements that she slept during the day, but slept at night with knives.   *Id.*   Similarly, Dr. Legum pointed out that Plaintiff's representation of auditory hallucinations was weak.   *Id.*   Consequently, Dr. Legum concluded that, based upon the information Plaintiff provided to date, he believed that she was malingering because of the contradictions and the lack of specificity made her overall presentation questionable.   *Id.*   His impressions were alcohol dependence, provisional, alcohol induced hallucinations, provisional, and malingering.[4]   *Id.*   He assigned a Global Assessment of Functioning (GAF) score of 50-55.[5]   R. 332.

---

[4]   The ALJ noted: "Following the November 2007 consultative psychological examination, Dr. Legum determined the overall presentation of the claimant was questionable because of repeated contradictions and the lack of specificity provided by the claimant during the interview, and his diagnoses included malingering (Exhibit 1F). The fact that this mental health professional questioned the reliability of the claimant's reports certainly affects her credibility."   R. 26.

[5]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."   *See* DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.   See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A score of 21-30 refers to behavior that "is considerable influenced by delusions or hallucinations OR serious impairments in communication or judgment   . . . OR inability to function in almost all areas."   DSM-IV-TR 34.   A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."   *Id.*   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*   A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has

On November 14, 2007, based upon a review of the medical evidence of record, Gary Buffone, Ph.D., a state agency reviewing psychologist, completed a mental RFC assessment and opined that Plaintiff would have no more than moderate limitations in any area of mental work functioning.   R. 335-36; *see* R. 26.   Dr. Buffone opined that Plaintiff retained the functional capacity to carry out simple instructions as reflected by her activities of daily living, but may have difficulty with tasks involving sustained focus and complex mental demands.   R. 337.   Dr. Buffone also opined that Plaintiff may have problems with supervisors and co-workers, but is able to interact appropriately on a limited basis "(shops, sees family/trters)."   *Id.*   Dr. Buffone indicated that Plaintiff may have difficulty with high stress/demand task situations and would likely benefit from assistance with goal planning.   *Id.*   The ALJ gave significant weight to Dr. Buffone's opinion.   R. 26.

Dr. Buffone also completed a Psychiatric Review Technique (PRT).   R. 339-53. Dr. Buffone opined that Plaintiff had moderate limitations (difficulties) in maintaining

---

some meaningful interpersonal relationships.   *Id.*

The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.   In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

social functioning and in maintaining concentration, persistence, or pace, mild restrictions of daily activities, and no episodes of decompensation, each of extended duration.   R. 349; *see* R. 351 (consultant's notes).

On March 3, 2008, based upon a review of the medical evidence of record, Val Bee, Psy. D., completed a PRT and opined that the evidence of record did not demonstrate that Plaintiff had a medically determinable mental impairment.   R. 353; *see* R. 365 (consultant's notes: "It does not appear that the claimant has any valid psychiatric disorder.   There may be some characterological issues and alcohol abuse, but this has not been confirmed.   Credible evidence of a mental impairment is not seen at this time."). The ALJ gave no weight to Dr. Bee's opinion as it was inconsistent with the medical evidence.   R. 26.

Plaintiff was hospitalized involuntarily under the Baker Act for three nights from January 8-11, 2008.   R. 477; *see* R. 23.   At that time, Plaintiff reported that her husband woke up the night before to find her standing over the bed with a knife, so he took the knife from her and they went back to bed and sought treatment the following morning.   *Id.* She also indicated that she was not taking any medication.   R. 478.   At that time, she reported no work history, R. 478, and stated that she was "unable to hold a job" due to her "attitude."   R. 489.   Significantly, she denied any fear for her safety or of being in her home and was unsure why she carried a knife with her or kept it under her bed.   R. 477. Plaintiff also reported hearing a clicking or buzzing noise that no one else hears that bothered her to the point that she kicked six holes in her walls at home.   *Id.*   She denied any command or human verbal hallucinations, but indicated that she does see shadows

and sometimes thinks people are talking about her.   *Id.*   She denied drinking any alcohol or using any drugs other than smoking a joint on New Year's Eve.   *Id.*   Although she stabbed her husband one year ago, the charges were dropped and she attended anger management instead.   *Id.*   The record indicates, "[t]he patient continues to live with her husband who removed all the knives in the home."   *Id.*

At the time of admission, Plaintiff's diagnosis was psychosis, NOS, with a GAF score of 22 to 30.   R. 477, 489; *see supra* n.5.   During a mental status examination, Plaintiff scored 27 out of 30.   R. 478, 486.   She was cooperative and her grooming and hygiene were appropriate.   R. 478.   Her mood was "okay" and her affect was guarded. *Id.*   Her insight and judgment were poor.   *Id.*   During the hospitalization, Plaintiff was started on Risperdal and given Trazodone for sleep.   R. 479.   At the time of discharge, her GAF score had improved to 45 or 50.   *Id.*

Following her discharge, Plaintiff sought follow-up treatment at the University of Florida Psychiatry Clinic (UFPC) on January 30, 2008.   R. 476.   At that time, she reported no active hallucinations.   *Id.*   A mental status examination revealed that Plaintiff was pleasant, friendly, and engaging.   *Id.*   Plaintiff's mood was euthymic.   She was cognitively intact.   Plaintiff had no active psychosis, but was mildly suspicious.   Her reasoning and judgment were intact and her insight was good.   Wayne L. Creelman, M.D., assessed Plaintiff with paranoid schizophrenia, rule out schizoaffective disorder, increased her dosage of Risperdal, and advised her to return in three or four weeks.   *Id.*

Plaintiff did not return to UFPC until March 27, 2008.   R. 475.   At that time, she reported that she had been hearing voices "most of the time," particularly her husband's

voice, and arguing with people.   *Id.*   Plaintiff indicated that she stopped her medications for a week at the beginning of March and last had an auditory hallucination three days ago.   A mental status examination revealed that Plaintiff had good eye contact and fair hygiene.   Plaintiff's thought process was linear.   Her affect was full and stable.   The examiner noted that Plaintiff was currently stable on Risperdal and had no paranoid delusions.   *Id.*

When Plaintiff returned on April 28, 2008, she reported that she was taking too much Risperdal by mistake, which made her extremely tired.   R. 474.   A mental status examination revealed good eye contact and a full affect.   *Id.*   Her thought processes were linear.   She denied any auditory hallucinations, paranoid ideation, or suicidal ideation.   Her insight and judgment were good.   Plaintiff was "looking for jobs."   She was advised to return in two to three weeks, but she did not attend her next scheduled appointment.   R. 473-74.

Plaintiff returned on May 27, 2008, stating that she was "doing well" since her last visit, was compliant with her medications, and denied any psychotic symptoms.   R. 472.   At that time, she again reported that she was looking for a job.   *Id.*   A mental status examination revealed that Plaintiff was casually dressed, well-groomed, and cooperative.   She had a stable mood and a full affect.   Her thought process was linear.   She reported no auditory hallucinations, no paranoid ideation, and no suicidal ideation.   Plaintiff's medications were continued.   Although Plaintiff was scheduled to return in one month, she canceled her June 2008 appointment.[6]   R. 471-72.

---

[6]   The ALJ noted that "[o]utpatient mental health treatment records reflect

When Plaintiff returned to UFPC on July 10, 2008, she complained of "breakdowns for the last two weeks" and paranoia ("there is some stranger in her house").   R. 470.   A mental status examination revealed that Plaintiff was cooperative with good eye contact and grooming.   *Id.*   Plaintiff's affect was pleasant.   *Id.*   She denied paranoia, suicidal ideation, and auditory/visual hallucinations.   *Id.*   She had good insight and fair judgment.   *Id.*   The examiner indicated that Plaintiff's GAF score was 66, which indicates mild symptoms.   *Id.*; *see supra* n.5.

At Plaintiff's follow-up visit on August 7, 2008, she reported having two psychotic breaks in which she thought someone was inside her wall.   R. 469.   A mental status examination revealed that Plaintiff had good eye contact, grooming, and hygiene.   *Id*. Plaintiff's thought process was logical, linear, and goal-oriented.   *Id.*   Her mood was reported to be "up and down," but her affect was pleasant.   *Id.*   She denied any suicidal or homicidal ideation, paranoid ideation, or auditory/visual hallucinations.   *Id.*   Her insight and judgment were fair.   *Id.*   The examiner increased Plaintiff's dosage of Risperdal.   *Id.*   Plaintiff's GAF score was 55.   *Id.*   Although Plaintiff was advised to return in two weeks, she did not attend her next scheduled appointment.   R. 468-69. When Plaintiff returned later that month, she reported "feel[ing] better," sleeping better, and denied any complaints.   R. 467.   She specifically denied paranoia and auditory or

---

noncompliance with attendance at scheduled appointments . . . as well as noncompliance with the consistent use of prescribed psychoactive medications."   R. 23 (citations to record omitted).

visual hallucinations.   *Id*.   Plaintiff's GAF score was 56.   *Id*.   The examiner noted that

Plaintiff's increased dosage of Risperdal had improved her symptoms.[7]   *Id*.

Plaintiff did not return to UFPC until October1, 2008.   R. 466.   At that time,

Plaintiff was "doing well" on her new dosage of Risperdal.   *Id*.   A mental status

examination revealed that Plaintiff was cooperative with good grooming and hygiene.   *Id*.

Her thought processes were logical, linear, and goal-oriented.   *Id*.   Plaintiff had good

insight and judgment.   *Id*.   The examiner indicated that Plaintiff's affect was euthymic

and she had no cognitive problems, nor active psychosis.   *Id*.

Plaintiff cancelled her next appointment at UFPC, but returned on November 6,

2008.   R. 464-65.   At that time, Plaintiff reported that she was restless, especially at

night, but she denied any paranoia or auditory hallucinations.   R. 464.   A mental status

examination revealed that Plaintiff was cooperative with good eye contact, grooming, and

hygiene.   *Id*.   Plaintiff's thought process was logical, linear, and goal-oriented.   *Id*.   Her

insight and judgment were good.   *Id*.   The examiner prescribed Klonopin for Plaintiff's

restlessness and continued her other medications.   *Id*.

Plaintiff cancelled her next follow-up appointment that was scheduled for

December 10, 2008.   R. 463.   When Plaintiff returned to UFPC in January 2009, she

indicated that she had been out of her medications for three weeks, but "she was feeling

sick and did not have the time to pick up [her] med[ication] or come to [an] appointment."

R. 462.   Plaintiff denied any paranoid ideation or relapse.   *Id*.   A mental status

---

[7]   The ALJ noted: "When attending appointments and taking medications as
prescribed, the claimant generally had few complaints and reported decreased symptoms
and overall improvement in her condition."   R. 23 (citations to record omitted).

examination revealed good eye contact, grooming, and hygiene.   *Id.*   Plaintiff's thought processes were linear and goal-oriented.   *Id.*   She denied any suicidal/homicidal ideation, auditory/visual hallucinations, or paranoid ideation.   *Id.*   Her affect was euthymic.   *Id.*   The examiner restarted Plaintiff's medications and advised her to return in four weeks.   *Id.*

Plaintiff did not return to UFPC for follow-up, however, until March 5, 2009. R. 461.   At that time, she reported that she stays in her room most of the day, "things move around her," and there is a woman inside her walls at home.   *Id.*   A mental status examination revealed good hygiene and fair eye contact.   *Id.*   Plaintiff's mood was "not too good," and her affect was congruent.   *Id.*   Her insight and judgment were fair.   *Id.* D. Ward, M.D., increased Plaintiff's dosage of Risperdal and prescribed Klonopin.   *Id.* Plaintiff was a "no show" for her April 2, 2009, appointment.   R. 460.

On March 13, 2009, Plaintiff was voluntarily hospitalized for three nights for complaints of increased paranoia and auditory/visual hallucinations along with depressive symptoms.   R. 373, 388; *see* R. 23.   Plaintiff indicated that since her outpatient psychiatrist adjusted her medications by reducing her dosage of Risperdal, she felt that her symptoms had worsened.   R. 388.   During this hospitalization, Plaintiff's auditory/visual hallucinations decreased, as well as her problematic behavior.   R. 373. Plaintiff "quickly returned to baseline" after taking Risperdal and was discharged in stable and improved condition.   *Id.*   At the time of discharge, Louis W. Solomon, M.D., diagnosed Plaintiff with bipolar affective disorder and Human Immunodeficiency Virus (HIV) and assigned a GAF score of 45.   *Id.*; *see supra* n.5.   (On admission, her GAF

score was 30-40.   R. 373, 389).   Plaintiff was to follow-up with Dr. Julie Rodriguez with a scheduled appointment on April 2, 2009.   R. 374.

Plaintiff did not attend her next scheduled session at UFPC in April 2009, R. 460, and did not return until June 20, 2009.   R. 459-60.   At that time, she reported being without medications for one week while she was in jail for selling cocaine.   R. 459; *see* R. 23.   She denied using cocaine or selling drugs in the past and also denied that her paranoia was related to illegal activity.   *Id.*   She admitted that her husband, who was also in jail, had been selling drugs for the past six months.   *Id.*   The examiner noted that although Plaintiff was without medications for one week, she was stable.   *Id.*   Dr. Ward restarted Plaintiff's prescription for Risperdal and advised her to return in four weeks.   *Id.*

At Plaintiff's July 20, 2009, follow-up visit, she reported being restless, but denied paranoia, anxiety or depression.   R. 458.   A mental status examination revealed that Plaintiff's mood was good, and her affect was euthymic.   *Id.*   Her thought process was logical, linear, and goal-directed.   *Id.*   Plaintiff denied any suicidal/homicidal ideation or auditory/visual hallucinations.   *Id.*   Plaintiff's perceptions, insight, and judgment were good.   *Id.*   The examiner increased Plaintiff's dosage of Klonopin and continued her prescription for Risperdal.   *Id.*   Plaintiff did not attend her next scheduled appointment in August 2009.   R. 457.

When Plaintiff returned to UFPC on September 14, 2009, she reported that she was still feeling restless and not sleeping well, but she denied any symptoms of psychosis, paranoia, or depression.   R. 455.   A mental status examination revealed that Plaintiff's mood was "good" and her affect was euthymic.   *Id.*   Her thought processes

were logical, linear, and goal-oriented.   *Id.*   Her insight and judgment were good.   *Id.*
The examiner prescribed Trazodone to help Plaintiff sleep.   *Id.*

At Plaintiff's next follow-up visit at UFPC on November 9, 2009, she reported that
she had run out of medications.   R. 454.   A mental status examination revealed that
Plaintiff's mood was "ok," and her affect was restless.   *Id.*   Her thought processes were
logical, linear, and goal-oriented.   *Id.*   She had good insight and fair judgment. *Id.*   The
examiner restarted Plaintiff's medication and encouraged medication compliance.   *Id.*
(The ALJ noted gaps in Plaintiff's mental health treatment between November 2009 and
October 2010.   R. 24.)

On October 28, 2010, Plaintiff sought treatment at the University of Florida
Department of Psychiatry stating that Dr. Julie Rodriguez at Springhill Health Center had
been treating Plaintiff until 11 months ago until she stopped treatment due to a
misunderstanding about finances.   R. 502.   She also admitted that she had not been
taking medication for the past five months.   *Id.*   Plaintiff indicated that she had
experienced symptoms for some time, but they worsened in the past one to two months
(mood swings, auditory/visual hallucinations, paranoid thoughts, etc.).   *Id.*   In contrast to
her statements on multiple occasions that she was fired from her most recent job,
R. 44-45, 243, 330, 505, she reported that she left her most recent job due to paranoia
and homicidal ideation, but she left on good terms with her supervisor, who praised her
work and advised her to get help.   R. 503.   In addition, although Plaintiff admitted
stabbing her husband in the chest during an argument, she indicated that this occurred
before she had been experiencing symptoms.   *Id.*   Plaintiff reported that she was

diagnosed with HIV six months earlier and was currently taking antiviral medications without side effects.   *Id.*   Plaintiff denied any drug use, but admitted that she spent 52 days in jail for selling drugs.   *Id.*   Nevertheless, she indicated, "it was her husband selling the drugs, not her, but in the eyes of the law she was found guilty because she was living with her husband and was aware of what he was doing."   *Id.*

A mental status examination revealed that Plaintiff was casually dressed and malodorous.   R. 505.   Her affect was polite, but guarded.   *Id.*   She was appropriately responsive to the emotional content of the conversation and was fully appropriate.   *Id.* Her thought process was circumstantial.   *Id.*   She was a poor historian and occasionally contradicted herself.   *Id.*   Her thought content was devoid of suicidal/homicidal ideation, and current auditory/visual hallucinations.   *Id.*   Her insight and judgment were fair.   *Id.* Alexandra R. Wang, M.D., diagnosed schizophrenia, paranoid type, and assigned a GAF score of 70.   R. 504; *see supra* n.5; *see also* R. 24.   She prescribed Abilify.   R. 504.

When Plaintiff returned to the UFPC clinic approximately a week later, she admitted that she had not started taking Abilify.   R. 500.   Nevertheless, she reported that her paranoid thoughts and auditory hallucinations were decreasing.   *Id.*   A mental status examination revealed that Plaintiff's mood was "good" with a full-range of affect. Plaintiff's thought processes were logical, linear, and goal-directed.   *Id.*   She had good insight and judgment.   She was advised to return in one or two weeks to evaluate her response to Abilify.   *Id.*   When Plaintiff returned on November 17, 2010, she denied any paranoid thoughts or auditory/visual hallucinations.   R. 499.   Plaintiff's mood/affect was

"good" and she was sleeping well.   Her thought process was logical, linear, and goal-directed.   The assessment was "[e]uthymic today."   She had good insight and judgment.   The examiner advised Plaintiff to continue her current medications and return in four weeks.   *Id.*

At Plaintiff's next follow-up visit in December 2010, she reported "feeling a little down lately" and one night felt paranoid that someone was in the house.   R. 498. Otherwise, she was sleeping and eating well.   A mental status examination revealed that Plaintiff's thought processes were logical, linear, and goal-directed.   She denied any auditory or visual hallucinations.   She had good insight and judgment.   Julie Demetrie, M.D., increased Plaintiff's dosage of Abilify and advised her to return in four weeks.   *Id.*

On March 24, 2011, Plaintiff sought treatment at the University of Florida Outpatient Psychiatry Clinic.   R. 495-96.   At that time, she complained of forgetfulness and stated that her kids feel she is "moving in slow motion" since beginning Abilify, although she was compliant with her medications and no side effects are noted. R. 495; *see* R. 24.   She denied any auditory or visual hallucinations, but admitted that she felt like people were talking about her at her cousin's party.   A mental status examination revealed that Plaintiff was well-groomed with good eye contact.   *Id.*   Her thought process was coherent, linear, and logical.   R. 496.   She had no looseness of association or flight of ideas.   Although she endorsed paranoid thoughts, she did not exhibit any during the interview.   Her recent and remote memory was grossly intact. Her concentration, insight, and judgment appeared adequate.   Her fund of knowledge was appropriate.   Her mood was okay and she was not alexithymic.   Dr. Wang

diagnosed chronic schizophrenia, paranoid type.   *Id*.   She assigned Plaintiff a GAF

score of 65 to 70.   *See supra* n.5.   Dr. Wang increased Plaintiff's dosage of Abilify and

advised her to return in four weeks.   *Id*.   (The ALJ again noted a gap in her mental

health treatment from March 2011 until October 2011.   R. 24.)

Plaintiff also sought treatment for her HIV at Alachua County Health Department

from October 2010, until February 2012.   R. 508-70; *see* R. 24.   At an October 2011

visit, Plaintiff agreed to start Complera, which was not covered by her insurance for her

HIV because she could not tolerate Truvada.   R. 545, 547.   An October 2011 note

indicated that Plaintiff called her case manager on October 20, 2011, reporting that she

was hearing voices in her wall and when they get bad, she stabs the wall with a knife.   R.

554.   Plaintiff's case manager noted that Plaintiff was to discuss her mental health

symptoms with her physician the previous day, but the physician specifically indicated

that she did not report any such symptoms that day.   R. 555.   Consequently, Plaintiff

was advised to come in for an evaluation or to go to the emergency room, but there is no

evidence to suggest that she followed these instructions.   *Id*.

It appears Plaintiff's last reported visit with the health department was on February

29, 2012.   R. 566-70; *see* R. 24.   Her only reported medication was Diovan, R. 567,

which was also reported being prescribed in October 2011.   R. 557.   There is also a

patient note indicating that Plaintiff's insurance did not cover Edurant or Complera.   *Id*.

(The ALJ noted that Plaintiff "testified that she had been prescribed Risperdal at her most

recent appointment (presumably February 2012) but this is not consistent with either the

February 29, 2012[,] Health Department medication summary (Exhibit 12F/25 [R. 567]) or

the medication list provided by the claimant in April 2012 (Exhibit 18E [R. 321]) that both

show Diovan, prescribed for blood pressure control, as the claimant's only medication."

R. 24.)

## V.   Hearing Testimony, Plaintiff's Statements, and the Vocational Expert's Testimony

Plaintiff testified at the hearing in April 2012.   R. 65-87.   Plaintiff was 44 years old

as of the hearing.   R. 73.   Plaintiff did not graduate from high school but completed the

11th grade.   R. 74, 86-87.

Plaintiff testified that she was arrested in 2009 on cocaine charges and accepted a

plea that required her to participate in a court drug program, which she successfully

completed.   Plaintiff stated that it was her husband who "[did] it," but she was also

arrested.   R. 74-75.

Plaintiff indicated that she was not taking any antiviral medications for her HIV

because her previous medications were making her sick.   R. 76-78.   Although she

denied being prescribed another medication aside from her high blood pressure

medication, the record indicated that she was prescribed Complera instead of Truvada

due to nausea.   R. 76-78, 545, 547.

At Plaintiff's prior hearing on November 23, 2009, she testified that she was

married and her husband was retired.   R. 42.   Although she previously reported that one

of her leisure activities included reading, R. 368, Plaintiff testified that she was unable to

fill out the forms for social security because she was unable to read them.

R. 44.   Plaintiff indicated that she was fired from her most recent job at Molly Maid

because she was misbehaving due to her hallucinations.   R. 44-45.   (Plaintiff worked at

private residence for the last 15 years as a housekeeper.   R. 75.   The heaviest amount she lifted while so employed was about 20 pounds.   *Id.*)   Plaintiff acknowledged that she was arrested for selling cocaine and she admitted that she sold cocaine for about a year. R. 56.

On forms completed in connection with Plaintiff's application for benefits, Plaintiff indicated that she can read and understand English.   R. 231.   She indicated that she prepared her own meals and performed household chores, including laundry, sweeping, and ironing.   R. 239.   She indicated that she shopped in stores monthly for food and clothes.   R. 240.   Plaintiff acknowledged that she was fired from her most recent job at Molly Maid because she had problems getting along with others and was not following instructions.   R. 243.

A vocational expert, who was present for Plaintiff's testimony and reviewed the relevant evidence of record, also testified.   R. 87-92.   The vocational expert testified that Plaintiff's past work as a day worker with Molly Maid was unskilled medium work, but her past work as a hotel housekeeper was performed as light work.   R. 88; *see* 20 C.F.R. § 404.1567(b) (definition of light work).

The ALJ asked the vocational expert (a second hypothetical question) to consider Plaintiff's age, education, and work experience, as well as the fact that she was limited to a full range of light work including lifting 20 pounds occasionally and 10 pounds frequently; standing, walking, and sitting six hours each in an eight-hour work day with no restrictions on pushing and pulling with arms and with her feet; no restrictions in climbing, including scaffolds and ropes, stairs, ladders; she can bend, crouch, balance, stoop,

squat, crawl, kneel; she would have no limitations on her use of her hands and her arms;

and no environmental limitations.   The limitations would include only a one and two-step

job with production pace demand or frequent contact with people, which should be only

superficial at best.   R. 89.

Based upon these hypothetical restrictions, the vocational expert testified that

Plaintiff could perform unskilled light work positions as a housekeeping cleaner, library

page, and flagger (such as on a construction site or a highway).   Each job has as an SVP

of 2.[8]   R. 90.   The vocational expert explained that these jobs can be physically done at

the light level, without a production pace, as simple work, and only with superficial contact

with people "[b]y reviewing the codes in the DOT relating to SVP reasoning, math, and

language, and the temperaments that are required."   R. 90-91.   The vocational expert

opined that the jobs are consistent with the DOT.   R. 91.

## VI.   The ALJ's Credibility Findings

The ALJ considered Plaintiff's testimony in light of the medical and other evidence

and made several credibility findings.   The ALJ did not find Plaintiff's reported fatigue

debilitating.   The ALJ resolved all doubt in Plaintiff's favor, however, and found "her

physical impairments cause more than minimal limitation in her ability to perform basic

work activities and restrict work activity to light work in the " RFC.   R. 24; *see* R. 25

(additional findings regarding complaints of fatigue).

---

[8]   "Unskilled work is work which needs little or no judgment to do simple duties that
can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   An SVP
of 1 or 2 corresponds to unskilled work.   Social Security Ruling (SSR) 00-4p (Dec. 4,
2000).   An SVP of 2 means "[a]nything beyond short demonstration up to and including 1
month."   Dictionary of Occupational Titles (DOT) (4th Ed. Rev. 1991), Appendix C:
Components of the Definition Trailer, § II, SVP.

The ALJ also searched the record for evidence that would support Plaintiff's

allegations regarding her limitations related to her severe impairments, but found "that the

objective evidence fail[ed] to provide a compelling basis for the claimant's statements

regarding her inability to perform basic work activities."   R. 25.

The ALJ found that Plaintiff's "mental health symptoms were adequately controlled

when the claimant was compliant with treatment recommendations."   The ALJ further

noted that Plaintiff missed mental health appointments and "her compliance with

prescribed medication was spotty."   R. 25.   The ALJ found that Plaintiff's daily activities

were not as limited as expected given Plaintiff's complaints of disabling symptoms and

limitations.   R. 25.   The ALJ then made the following credibility findings:

> When evaluating the credibility of the claimant's statements, I have considered the
> inconsistent information provided by the claimant within the record.   Following the
> November 2007 consultative psychological evaluation, Dr. Legum determined the
> overall presentation of the claimant was questionable because of repeated
> contradictions and the lack of specificity provided by the claimant during the
> interview, and his diagnoses included malingering (Exhibit 1F).   The fact that this
> mental health professional questioned the reliability of the claimant's reports
> certainly affects her credibility.   Further, the claimant's reports of drug activity are
> unclear.   While the claimant denied the use of drugs (Exhibit 10F/11), she did
> admit using cocaine out of curiosity (Exhibit 8F/6) and marijuana (Exhibit 9F/2).
> The claimant provided varying accounts of her 2009 drug charges.   In June 2009,
> treatment records state that she was "caught selling cocaine on the street" (Exhibit
> 8F/6) but in October 2010, the claimant said that she was found guilty because of
> her awareness of her husband selling drugs (Exhibit 10F/10). Although the
> inconsistent information provided by the claimant may not be the result of a
> conscious intention to mislead, nevertheless the inconsistencies suggest that the
> information provided by the claimant generally may not be entirely reliable.
>
> Overall, the claimant's functional abilities indicate a good tolerance for some level
> of work activity, and limitations related to the claimant's severe impairments have
> been allowed for in the residual functional capacity described above.   Despite
> claiming a complete inability to work, the record provides no convincing evidence
> over time, and I cannot find the testimony and alleged limitations of the claimant to
> be well supported by the evidence of record.

> As for the opinion evidence, the record does not contain any opinions from treating or examining physicians indicating the claimant is disabled or even has limitations greater than those determined in this decision.

R. 26.   The ALJ also considered reports completed by Plaintiff's mother and her husband and gave them little weight.   R. 27.   The ALJ summarized her ultimate findings:

> In sum, the claimant's activities of daily living, the totality of the medical evidence of record, and the findings of the State agency suggest that the claimant can sustain a greater capacity for work than has been alleged in connection with this application.   Given this evidence, I conclude that the claimant's subjective complaints and alleged limitations are not fully persuasive.   The objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in physical or mental symptoms of such a severity or frequency as to preclude the range of work described in the residual functional capacity set forth above.   I find that the claimant retains the ability, despite her impairments, to perform a range of light exertional work activity.

R. 27.

## VII.   Legal Analysis--Substantial Evidence Supports the ALJ's Hypothetical Questions Posed to the Vocational Expert

Plaintiff argues that the hypothetical questions posed by the ALJ to the vocational expert were incomplete because they did not include all of Plaintiff's impairments, namely Plaintiff's "moderate inability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and a moderate inability to accept instructions and respond appropriately to criticism from supervisors."   Doc. 15 at 26 (*quoting* from R. 336 (Dr. Buffone)).   Plaintiff suggests that this omission was serious "considering that the treating physicians all believe Plaintiff Maxwell suffers from chronic mental illness."   Doc. 15 at 26-27 (citing R. 372, 389, 469, 470, 496).

The Commissioner argues that Plaintiff's reliance on the opinion of state agency psychologist, Dr. Buffone, is based on a misinterpretation of his opinion, which, according to the Commissioner, "simply does not preclude completing a normal work day or work week as she believes.   Instead, Dr. Buffone merely opined that Plaintiff had "moderate" limitations in this area that could be accommodated by a limitation to simple instructions and tasks (i.e., unskilled work) (Tr. 337)."   Doc. 18 at 19.

In the argument portion of her memorandum, Plaintiff refers to one page of Dr. Buffone's November 14, 2007, mental RFC assessment in which he checked three boxes indicating that Plaintiff was moderately limited as noted above, R. 336. Doc. 15 at 26.   Plaintiff also refers to several pages of the record where treating physicians have stated that Plaintiff suffers from chronic mental illness, citing to R. 372 [sic] [373], 389, 469, 470, 479 (Plaintiff discharged with "no special instructions on diet or activity"), and 496 (Abilify was increased; no therapy recommended; and "[n]o orders of the defined types were placed in this encounter").   *Id.* at 26-27.   The examiners do not opine that Plaintiff is unable to work.

Dr. Buffone did not opine that Plaintiff was precluded from completing a normal work day or work week.   *See* R. 331-32 (Dr. Legum opining that Plaintiff was malingering.   *See supra* at 7-9.).   Instead, Dr. Buffone opined that Plaintiff had moderate limitations, which included that Plaintiff may have difficulty with high stress/demand task situations that could be accommodated by a limitation to simple instructions and tasks, limited interaction with supervisors and co-workers, and assistance with goal-planning.   R. 337.

The ALJ recognized that Plaintiff exhibited several severe limitations that affected her ability to perform basic work activities.   R. 20; *see* 20 C.F.R. § 404.1520(c).   The ALJ discussed the relevant evidence including the objective medical evidence, Plaintiff's reported daily activities, and Plaintiff's hearing testimony and her credibility.   R. 21-27.   The ALJ determined this evidence did not demonstrate Plaintiff's condition precluded her from working.   *Id.*   Substantial evidence supports this conclusion.

Consistent with this evidence, the ALJ accounted for Plaintiff's moderate difficulties in social functioning and regarding her concentration, persistence, or pace by including, among other factors, in her hypothetical question to the vocational expert that the individual (Plaintiff) be limited to work that would include only a one and two-step job with no production demand or frequent contact with people, which should be only superficial at best.   R. 89.   These factors are included in the ALJ's RFC determination. R. 22.

In response to the hypothetical question, the vocational expert opined that Plaintiff could be perform several representative unskilled, light jobs of housekeeping cleaner, library page, and flagger.   R. 89-90.   The vocational expert is a specialist in employment and vocational factors influencing employment.   *See* Phillips, 357 F.3d at 1240.   The hypothetical question posed to the vocational expert was consistent with the ALJ's findings based on the medical and other evidence of record, and the ALJ's credibility findings.   *See* Smith v. Comm'r of Soc. Sec., 486 F. App'x 874, 876 (11th Cir. 2012) (unpublished).   Plaintiff has not demonstrated the ALJ erred in posing the

hypothetical question to the vocational expert.   The ALJ's decision is supported by substantial evidence and she appropriately applied controlling law.

## VIII.   Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.   Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits should be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on April 21, 2014.

s/   Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**